

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-27-1998

# Morgan v. Perry

Precedential or Non-Precedential:

Docket 96-3314

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Morgan v. Perry" (1998). *1998 Decisions*. Paper 93.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/93

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 27, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-3314

TERENCE D. MORGAN,

      Appellant

v.

WILLIAM PERRY, in his capacity as Secretary of Defense;
JOHN DALTON, in his capacity as Secretary of the Navy;
GENERAL C. E. MUNDY, in his capacity as Commandant
of the Marine Corps; BRIGADIER GENERAL J.W. CLIMP,
in his capacity as Commanding General, Marine Corps
Recruit Depot, Eastern Recruiting Region, Parris Island.

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Civil No. 91-1064)

Argued: April 30, 1997

Before: MANSMANN and McKEE, Circuit Judges, and
VANARTSDALEN, Senior District Judge*

(Opinion Filed: April 27, 1998)

        JAMES B. LIEBER, ESQ. (Argued)
        M. JEAN CLICKNER, ESQ.
        Lieber & Hammer, P.C.
        5528 Walnut Street
        Pittsburgh, PA 15232
        Attorneys for Appellant

_____

*The Honorable Donald W. VanArtsdalen, United States District Court
Judge for the Eastern District of Pennsylvania, sitting by designation.

FREDERICK W. THIEMAN, ESQ.
United States Attorney
BONNIE R. SCHLUETER, ESQ.
Assistant U.S. Attorney
ALBERT W. SCHOLLAERT, ESQ.
  (Argued)
Assistant U.S. Attorney
633 U.S. Post Office & Courthouse
Pittsburgh, PA 15219
Attorneys for Appellees

SAMUEL J. CORDES, ESQ.
MICHAEL A. MURPHY, ESQ.
Ogg, Jones, Cordes & Igenlzi, LLP
245 Fort Pitt Boulevard
Pittsburgh, PA 15222
Attorneys for Amicus, The Allegheny
County Bar Association

JOHN PUSHINSKY, ESQ.
1808 Law & Finance Building
Pittsburgh, PA 15219

WITOLD J. WALCZAK, ESQ.
American Civil Liberties Union,
Greater Pittsburgh Chapter
237 Oakland Avenue
Pittsburgh, PA 15213
Attorneys for Amicus, The American
Civil Liberties Union of PA

OPINION OF THE COURT

McKEE, Circuit Judge

We are asked to determine whether the district court abused its discretion in denying attorney's fees and costs to a "prevailing party" under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. S 2412. Terence D. Morgan, a former Master Sergeant in the United States Marine Corps,filed a civil action seeking declaratory and injunctive relief against the defendants for alleged violations of his constitutional rights.

2

After a non-jury trial, the district court found that all but one of his claims were without merit, and awarded Morgan declaratory and equitable relief based upon the single meritorious claim. However, in a subsequent fee application under the EAJA, the court held that the government's position in defending Morgan's due process claim was substantially justified and denied Morgan's claim for attorney's fees and costs. This appeal followed. For the reasons that follow, we will affirm.

I. FACTUAL BACKGROUND

The circumstances leading up to this suit are as complex as they are intricate. The district court correctly stated that "[t]he factual allegations of plaintiff's complaint are too lengthy to summarize. However, the essence of the complaint is a wide-ranging conspiracy among various officers of the United States Marine Corps to `ruin [plaintiff's] reputation.' " Dist. Ct. EAJA Op. at 2. The government's investigation of Morgan centered upon allegations of recruiting fraud; however, our analysis must focus on the agency decision that resulted in this appeal. That decision resulted from a military prosecutor's assertion that he had a "gray book" that purportedly contained evidence that Morgan was involved in illegal gambling. In order to understand the significance of the "gray book" and its impact on Morgan's claim for costs and fees under the EJAJ it is necessary to detail the events leading up to this appeal and the structure of the Marine Corps' recruiting efforts at some length.[1]

A.

Terence D. Morgan joined the United States Marine Corps in September, 1973. After receiving various promotions, he was ordered to the Greensburg substation of Pittsburgh, Pennsylvania Recruiting Station ("RS") in June of 1980. RS Pittsburgh is part of the 4th Marine Corps District,

_____

1. Morgan did not appeal from the district court's decision on the merits of his claim. Consequently, the recitation of the facts is taken from the district court's merits opinion.

3

headquartered in Philadelphia, Pennsylvania. The 4th Marine Corps District in turn is part of the Eastern Recruiting Region, which is headquartered at Parris Island, South Carolina. Major General Jarvis D. Lynch, Jr., became the Commanding General of the Eastern Recruiting Region and Parris Island on October 5, 1988. Colonel David A. Jones was then the Director of the 4th Marine Corps District, which encompasses nine recruiting stations in seven states.

A recruiting station is operated by a Command Group. During the periods relevant to this appeal, Major George A. Eberhart, Jr., was the Commanding Officer. A recruiting station is organized around recruiting substations, which are recruiting facilities manned by one or more full-time recruiters. A recruiting substation is under the direct operational and administrative control of the recruiting station and is supervised by a Non-Commissioned Officer in Charge ("NCOIC"). A Command Group's main concern is ensuring that the recruiting station makes its "mission", i.e., procures a specified number of new recruits who are willing and eligible to enlist, and to ship a specified number of these new recruits for basic training. Recruiters are rated largely by the number of recruits they enlist in the Marines.

Normally, an applicant must have a high school diploma to enlist in the Marine Corps. A General Equivalency Diploma ("GED") is not acceptable. Recruiters are permitted to place eligible recruits who are willing to ship to basic training within 365 days of signing the enlistment contract into the Delay Entry Program ("DEP"). High school seniors who anticipate graduating within one year are also permitted to sign enlistment contracts and enter the DEP pool. These "poolees" sign a contract evidencing their intent to be subject to the Uniform Code of Military Justice ("UCMJ"). In addition, people with temporary medical conditions that preclude immediate shipment for basic training, and people with other non-permanent disqualifications, are allowed to sign enlistment contracts and enter the DEP pool. A large DEP pool enhances a recruiting station's ability to meet its monthly shipping mission. A DEP pool containing poolees who are not qualified to join the Corps for some reason, such as the

4

lack of a high school diploma or a disqualifying medical condition, is referred to as a "dirty pool".

A recruiter prepares a package for each "poolee" including inter alia, a high school diploma, social security card, birth certificate and medical form. Recruit packages are the direct responsibility of the individual recruiter, the NCOIC of the recruiting substation, the Commanding Officer, the Operations Officer and the "MEPS" liaison.[2]

Morgan was selected "Rookie Recruiter of the Year" after his first year of recruiting duty in 1983, and promoted to the rank of NCOIC of the Greensburg substation of RS Pittsburgh. In 1984, he was named "Non-Commissioned Officer (`NC0') of the Year." In late 1985, Morgan was promoted to the rank of Assistant Recruiting Instructor for RS Pittsburgh. Master Sergeant ("MSG") Eugene Zuro was then the Recruiting Instructor of RS Pittsburgh; however, Morgan replaced him in January of 1986. The Recruiting Instructor is the most senior professional recruiter in a recruiting station, but need not be the most senior NCO within the recruiting station. The Recruiting Instructor travels throughout the recruiting station to train recruiters in sales techniques and the completion of paperwork, and provides assistance to recruiters who are having trouble making "mission." For our purposes, it is important to note that the Recruiting Instructor has no duty to verify recruit packages.

B.

In 1984 and 1985, RS Pittsburgh ranked first in the nation in recruiting. It was then under the command of Major J. P. Walsh. In 1986, Major Eberhart became the Commanding Officer and he was determined to continue

_____

2. "MEPS" is the abbreviation for Military Entrance Processing System, which is a service shared by all branches of the military that recruit applicants. It conducts medical exams, administers tests and otherwise processes applicants. The MEPS liaison is the quality control person for the Commanding Officer of a recruiting station. He or she is not a member of the Command Group and does not have to make "mission". Rather, the MEPS liaison's prime concern is to ensure adherence to military regulations. Dist. Ct. Merits Opn. at 6.

5

that success. This created tremendous pressure to"make mission."

Despite Eberhart's determination to continue the Recruiting Station's success, RS Pittsburgh barely made its mission in September, 1988, and by October 1, 1988, RS Pittsburgh was in serious trouble. In response to the decreasing number of recruits, the station began enlisting and shipping qualified recruits to Parris Island for basic training within 30 days of their enrollment. This procedure was known as "direct ship mode." However, it is difficult for a recruiting station to meet its monthly mission by operating in "direct ship mode."

Morgan began inspecting recruit packages that had been prepared at RS Pittsburgh and he discovered that 350 documents were missing from those packages, including high school diploma verifications.3 The Marine Corps has strict regulations regarding education verification, and recruiters are required to obtain a high school counselor's signature or a school seal on a copy of the applicant's transcript or diploma before an applicant is processed for shipping to Parris Island. The large number of missing documents caused Morgan to ask Eberhart to conduct an inspection, but Eberhart merely responded by assuring Morgan that he would "take care of [the recruiter in question]," and refused to make an inspection.

Despite Eberhart's assurances, Morgan called Zuro, the former Recruiting Instructor of RS Pittsburgh, and a member of the Contact Team for the 4th Marine Corps District.4 Morgan told Zuro that RS Pittsburgh was in "direct ship" mode; that documents were missing from recruit packages; that Eberhart was submitting false

_____

3. Testimony at trial established that all recruiting stations have documents missing from recruit packages. However, it was unusual to have 300 to 400 missing documents unless the size of the DEP pool was very large.

4. Contact Teams are comprised of a small group of individuals who are experts in the field of recruiting. The Team provides guidance to recruiting stations and is required to visit each recruiting station twice a year. They conduct investigations, and also provide guidance. Dist. Ct. Merits Opn. at 10, n.9.

6

information to the 4th Marine Corps District concerning the number of DEP pool discharges and the need for direct ship applicants; and that he was having serious arguments with Eberhart. Zuro told Morgan that he would visit RS Pittsburgh at the end of October, 1988, which was apparently the Contact Team's next regularly scheduled visit to RS Pittsburgh.

C.

At the end of October, 1988, the Contact Team visited RS Pittsburgh. Morgan and First Lieutenant Brown, the Operations Officer of RS Pittsburgh, compiled a list of pending DEP pool discharges, missing documents and other problems. Morgan informed the Team of numerous improprieties and/or problems, including Eberhart's refusal to discipline recruiters, Eberhart's use of threats to enhance recruiting and his practice of requiring that recruiters be in their offices from 6:00 a.m. to 11:00 p.m. Zuro responded by telling Morgan that the Contact Team would not conduct an inspection of RS Pittsburgh during the visit. Zuro apparently believed it was more important to provide additional training.

On November 1, 1988, Captain Hoffman, the officer in charge of the Contact Team, prepared a memorandum for Colonel David A. Jones, Director of the 4th Marine Corps District, concerning the Contact Team's October visit to RS Pittsburgh. The memo discussed the DEP pool problems at RS Pittsburgh and described the training that was provided by the Contact Team. A reorganization of the structure of the substations of RS Pittsburgh was "highly recommended to avoid further turmoil and maximize prospecting." In early November, 1988, Colonel Jones called Eberhart to discuss his concern about the number of discharges in the DEP pool. Eberhart acknowledged that he had to take some discharges, but said that the DEP pool would be "cleaned up" in the next few months.

Nevertheless, Colonel Jones remained concerned about the problems in RS Pittsburgh and sent Colonel Niewenhous, Executive Officer of the 4th Marine Corps District, to talk to Eberhart. Niewenhous met with

Eberhart, but Eberhart vehemently denied that there were problems in RS Pittsburgh.

When General Lynch became the Commanding General of the Eastern Recruiting Region and Parris Island in early October, 1988, he had no experience in recruiting, and he requested a briefing on the subject. He subsequently received, and reviewed, a detailed briefing, but was not sure that the problems at RS Pittsburgh were caused by misconduct or ineptitude. Accordingly, he ordered Colonel C.R. Casey, his Deputy Chief of Staff for Recruiting, to investigate the situation and remedy it. The ensuing investigation stemmed solely from the detailed briefing General Lynch had received from his staff and was totally unrelated to Morgan's complaints about missing documents, and the high rate of discharges from the DEP pool maintained by RS Pittsburgh. In fact, Lynch did not know Morgan and had never been informed about Morgan's complaints.

D.

About the same time that Lynch was being briefed, George Sens, a new recruit from RS Pittsburgh, was shipped to Parris Island for basic training. After he reported, Sens admitted that he had a bleeding ulcer. That medical condition should have precluded his enlistment in the Marines. Sens said that he had informed his recruiter of his medical condition, and had been told not to tell the doctors at Parris Island. Based on Sens' statement, other recruits who had been shipped for basic training from RS Pittsburgh were interviewed. During those interviews, approximately 80 recruits made allegations of recruiting misconduct at RS Pittsburgh.

On Friday, January 27, 1989, Colonel Jones, Director of the 4th Marine Corps District, received a telephone call from Colonel Casey, General Lynch's Deputy Chief of Staff for Recruiting, regarding the allegations of recruiting misconduct by RS Pittsburgh's recruiters. Jones was instructed to send out a team to investigate, and, on Saturday, January 28, 1989, he assembled an investigating team. The Senior Investigating Officer was Lieutenant

Colonel John Spencer Evans, and the team included Captain D.J. Koleos, a lawyer who was assigned to provide legal advice to the investigating team. Koleos was Deputy Staff Judge Advocate for the Eastern Recruiting Region, and it is his actions that would later be the basis for the relief the district court afforded Morgan.

Lieutenant Colonel Evans team began its investigation in Pittsburgh on the morning of Monday, January 30, 1989. Captain Evans,5 who was a member of Lieutenant Colonel Evans investigation team, read each individual who was interviewed, his or her rights under Article 31 of the UCMJ, 10 U.S.C. S 831. Those rights are similar to Miranda warnings. No allegations of recruiting misconduct had been made against Morgan prior to the Evans investigation. Indeed, Morgan was initially elated because he assumed the investigation was in response to his complaints.

However, an applicant named Michael Lockwood was processed at RS Pittsburgh during Evans' investigation. When Lockwood was confronted with a false high school diploma that was part of his recruit package, he said that Morgan had procured the false diploma for him. Lockwood then identified Morgan's picture from a group photograph of the members of RS Pittsburgh. He also identified Morgan in Colonel Evans' presence, and stated that Morgan was the Marine who had sold him the false diploma.

Morgan denied this allegation and told Colonel Evans that he had never seen Lockwood before. Another member of the investigating team, Master Sergeant Cawman, then accused Morgan of having a printing press in his basement. Morgan said that allegation was ludicrous, and requested legal counsel. Captain Evans responded by telling Morgan that he was a legal advisor. Morgan then talked to Captain Evans for 30 to 45 minutes.6 During that conversation

_____

5. There are two officers named Evans who figure in this case. Lieutenant Colonel John Spenser Evans was the head of the investigating team and Captain John E. Evans was a member of that team. To avoid any possible confusion, we will indicate each Evans by rank when reference is made to him.

6. Captain Evans was not an attorney. Apparently, he served as an advisor to the Commanding Officer in the area of personnel

9

Morgan told Evans that he never met Lockwood and that he had not created any false high school diplomas. On February 2, 1989, Morgan made a written statement to that effect in response to a request from Evans that he do so. Morgan was not provided independent legal counsel.

E.

Colonel Evans completed his investigation and prepared a report for Colonel Jones. Evans' report concluded that administrative procedures were not in place at RS Pittsburgh to insure that quality control of recruits received as much emphasis as recruiting and shipping them. The report alluded to the existence of various factions of "cliques" at RS Pittsburgh, concluded that Morgan was the leader of one of these "cliques," and that his "clique" appeared to be at the center of the bulk of recruiter malpractice there. Colonel Evans opined that Morgan, "[i]n his capacity as the senior expert on enlisted recruiting, . . . bears a tremendous amount of responsibility for the problems in Pittsburgh." Although Colonel Evans was not personally convinced that Morgan had made a false diploma as alleged by Lockwood, he did not doubt that Morgan knew that diplomas and other documents were being falsified. The report rejected Morgan's claim that he lacked the training and experience to identify and deal with the problems in RS Pittsburgh.

Colonel Evans recommended various forms of discipline for 29 Marines at RS Pittsburgh, including members of the Command Group and recruiters. The recommended discipline ranged from nonjudicial punishment ("NJP")7

_____

administration, and advised the Commanding Officer on legal matters. Evans claims that he never represented himself to Morgan as an attorney. However, Morgan's testimony to the contrary was corroborated by other recruiters of RS Pittsburgh who also testified that Captain Evans led them to believe that he was acting as their legal counsel during the investigation. Moreover, although the district court did not make a specific finding of fact as to this conflict in the testimony, it is clear from the court's opinion that it credited Morgan's testimony on this point despite Evans' denial. See Dist. Ct. Opn. at 16-17, n.19.

7. Nonjudicial punishment is governed by Article 15 of the UCMJ, 10 U.S.C. S 815. It is a summary procedure designed to allow a commander to quickly impose minor punishment for minor offenses committed by members of his command. See generally, DAVID A. SCHLUETER, MILITARY CRIMINAL JUSTICE: PRACTICE AND PROCEDURE, SS 3-1 to 3-8 (4th ed. 1996).

10

such as letters of caution, to summary[8] and special court-martials.[9] Evans also recommended that Major Eberhart be relieved of duty despite Evans' belief that Eberhart did not intentionally direct the enlistment of any unqualified applicant into the Marine Corps.

Evans' report contained findings of fact with respect to members of the Command Group and the recruiters for whom Evans recommended disciplinary action. Colonel Evans found that Morgan was involved in the procurement of false diplomas for several recruits. The allegations as to one recruit, Wayne Bellew, were corroborated by Bellew's civilian wife, Tracey. Another recruiter stated that Morgan was responsible for the improper education verification for a recruit named Angela Robinson. Evans also found that Morgan improperly administered the Armed Services Vocational Aptitude Battery test ("ASVAB") to two Marine Corps personnel and that he routinely used his government-owned car for personal business. The report noted that Morgan denied all of the allegations.

General Lynch was not satisfied with the report because it did not address the failure of the Command Group of RS Pittsburgh to fulfill its responsibilities. Consequently, he directed his Deputy Chief of Staff for Recruiting, Colonel Casey, to go to RS Pittsburgh to conduct a further investigation focusing on the Command Group. The Casey investigation team conducted numerous interviews at RS Pittsburgh, and issued a report noting the numerous allegations of misconduct against persons in the recruiting station. However, most were not corroborated by independent facts, and, typically, the allegations were

_____

8. A summary court-martial is designed to dispose of minor offenses in a simplified proceeding. SCHLUETER, supra note 9, S 1-8(D)(1). The maximum punishment that may be imposed includes confinement at hard labor for one month, forfeiture of two-thirds of one month's pay for one month, hard labor without confinement for 45 days or restriction for two months. 10 U.S.C. S 820.

9. A special court-martial is the intermediate court in the military's judicial structure. 10 U.S.C. S 816; SCHLUETER, supra note 9, S 1-8(D)(2). Maximum punishments include confinement at hard labor for 6 months and forfeiture of two-thirds of one month's pay for 6 months. A bad conduct discharge may also be assessed. 10 U.S.C.S 819.

11

refuted by the alleged perpetrator. To further complicate the situation, the accusers were often biased. Accordingly, Casey resolved uncorroborated allegations in favor of the accused. Though there was evidence of criminal conduct and dereliction of duty, Colonel Casey was convinced that the problems in RS Pittsburgh were the result of leadership failure.

Casey did, however, believe that Morgan deliberately helped recruiters falsely enlist high school juniors into the DEP; that Morgan created high school diplomas for the purpose of unlawfully enlisting unqualified applicants into the Marine Corps; that Morgan solicited a man named Jerry L. Williams to join in his criminal enterprise; that Morgan communicated a threat to Williams; and that Morgan gave a false statement to Colonel Evans during his investigation of RS Pittsburgh. Based on his findings, Colonel Casey recommended that Morgan's alleged recruiting misconduct be investigated pursuant to Article 32 of the UCMJ, 10 U.S.C. S 832, the military counterpart to a civilian grand jury.

Jerry L. Williams was a civilian who owned a printing shop called Precision Printing in Bedford, Pennsylvania. During the Evans investigation, several recruiters alleged that the services of Precision Printing had been utilized to make false diplomas for certain recruiters. Because these allegations were unsubstantiated in the Evans' investigation, Major Kelley, the legal advisor for the Casey investigation, directed Captain Koleos to contact Williams. Koleos did so and prepared a "Results of Interview of Mr. Jerry Williams, Owner of Precision Printing" which was made part of Colonel Casey's report.

In his report, Koleos stated that Williams accused Morgan of coercing him to create fraudulent documents for recruits who were not qualified for the Marine Corps. According to Koleos' report, Williams said that Morgan paid him to alter the names on original diplomas. Koleos' report stated that Williams, his wife and other employees could positively identify Morgan and the corporal who accompanied him when Morgan visited Williams' print shop.10

_____

10. At trial, Koleos contradicted the information contained in his "Results". Koleos testified that Williams could not remember the name of

12

F.

When Morgan learned of these allegations he called Captain Louis J. Puleo, a defense attorney at Parris Island. In March, 1989, Puleo assigned himself to be Morgan's defense counsel. On March 22, 1989, Corporal Palmer, one of the two recruiters who had implicated Morgan in recruiting fraud, told Puleo that the statements he had given to the Evans' investigating team regarding Morgan's involvement in recruiting fraud were false.

On March 27, 1989, numerous charges were preferred [11] against Morgan for violations of various provisions of the UCMJ.[12] He was charged with engaging in fraudulent recruiting practices on several, enumerated occasions (Charges I & III), improper administration of the ASVAB test (Charge III), making false statements regarding drug use of members of a recruiting substation (Charge IV), presenting a false claim for travel expenses (Charge V), and making a false statement under oath (Charge VI).

On March 28, 1989, Koleos interviewed Palmer, and Palmer told him that the statements he gave during the Evans' investigation were false. Koleos responded by telling Palmer that he would have to call Colonel Evans and Captain Evans. However, Palmer exercised his Article 31 rights under the UCMJ and spoke with his defense counsel, First Lieutenant Ansa. After speaking with Ansa, Palmer decided to remain silent. In response, Koleos implied that Palmer's record would suffer and Palmer may be disciplined if Palmer said anything against Colonel Evans or Captain Evans.

Nonetheless, despite Koleos purported threat, Palmer

_____

the Marine who had come to his shop for a false diploma. However, Koleos did testify that William's description of the Marine who came to his shop fit Morgan's description.

11. The preferring of charges is the first formal step in prosecuting a criminal case under the UCMJ. For a discussion of the process, see SCHLUETER, supra note 9, S 6-1.

12. Specifically, Articles 80, 81, 84, 92 and 134 of the UCMJ. 10 U.S.C. SS 880, 881, 884, 892 and 934.

made a statement on March 29, 1989. In that statement
Palmer declared:

> I was interviewed by Captain Koleos. During my
> conversation with the Captain, I made it clear that I
> was going to say things in court that would incriminate
> LtCol. Evans and Capt Evans, because I recanted my
> statements [to them]. The reason I recanted my
> statement is that they were made under pressure and
> I was cohersed (sic) and told by [both] Evans what to
> say there-for (sic), making them false statements.
> During my conversation with. . . Koleos he made it
> unmistakably (sic) clear that if I did not stick with my
> first two statements (which were false), that the
> sentence of my February 24, 1989 NJP would be
> vacated, which means a reduction in rank and
> forfeiture (sic) in pay. This came across to me as a
> threat.
>
> I am making this statement because I know that I
> will eventually have to make these statements in court
> and I know that they will vacate my sentence. And I
> want to have record of my knowledge of this prior to it
> happening.
>
> What I am saying is true and I do not feel an
> innocent man should be judged on statements that
> someone was pressured into making.

This statement was incorporated into a Stipulation for
Morgan's upcoming Article 32 hearing.13

Similarly, Williams (the owner of Precision Printing whose
accusations are set forth above) testified at a deposition
and denied ever incriminating Morgan. He stated that

_____

13. An Article 32 Investigation, 10 U.S.C. S 832, is, as noted earlier,
the
military counterpart to the civilian grand jury. According to the Manual
for Courts-Martial (MCM), United States (1995 Edition), "[t]he primary
purpose of [the Article 32 Investigation] is to inquire into the truth of
the
matters set forth in the charges, the form of the charges, and to secure
information on which to determine what disposition should be made of
the case." See Rules for Courts-Martial ("R.C.M.") 405(a), Discussion. No
charge may be referred to a general court-martial for trial until an
Article
32 investigation has been conducted. 10 U.S.C. S 832(a).

investigators were trying to "get the goods" on Morgan, but that he, Williams, could not assist them because he did not know Morgan and had never seen him. He flatly denied ever making the inculpatory statements against Morgan that Koleos had reported. On the contrary, Williams swore that he could not link Morgan to any fraudulent diplomas.

Williams testified that, on the contrary, it was the investigators who did the threatening. They purportedly told Williams that he was also under investigation; that he could be charged as a result of the investigation; and that the FBI might be notified of his conduct. Williams also testified that he had refused to sign a statement that Koleos had prepared which identified Morgan as the Marine who was coming into his shop for false diplomas.

Puleo was able to interview several key witnesses before the Article 32 hearing. The majority of them were Marine Corps applicants, who not only absolved Morgan of wrongdoing, but also identified other Marines who were involved in the recruiting fraud. In addition, they either stated that they had been pressured into implicating Morgan or denied making statements that had been credited to them in which they purportedly accused Morgan of improper conduct.

G.

The Article 32 investigation took place in Pittsburgh, Pennsylvania, on April 2 and 3, 1989. Major Ellen B. Healy was designated the Investigating Officer,[14] Captain Koleos was the government's counsel, and Captain Puleo was Morgan's counsel. Much of the testimony at that hearing exonerated Morgan. At the conclusion of the investigation, Major Healy prepared a report in which she stated that the government was not able to present key testimony, and that, with the exception of allegations relating to Charge III (the wrongful enlistment of a particular recruit), the charges against Morgan were not supported by the

_____

14. The Investigating Officer is appointed by the commanding officer. R.C.M. 405(d)(1). He or she conducts the investigation and makes a report of conclusions and recommendations. Id.

15

evidence. Moreover, the testimony as to even that charge was equivocal. The prosecution had produced testimony that Morgan directed a recruiter to fill out a false education verification. However, the witness stated that Morgan directed him to verify it the following day.

Based on the evidence at that hearing, Healy recommended that Morgan be subjected to NJP, the lowest form of punishment under the UCMJ. On April 6, 1989, Morgan was ordered to report to Parris Island.

Puleo was initially unable to interview Lockwood, the recruit who had first implicated Morgan in the scheme to falsify diplomas. However, Puleo finally was able to interview Lockwood after the Article 32 hearing, and Lockwood told him that he had lied to the investigating team. Lockwood said that Master Sergeant Cawman, a member of the Evans investigating team, told him that he (Lockwood) would have to implicate Morgan and Cawman told him what to say.

Based on Lockwood's allegations, Puleo preferred charges against Cawman.15 Puleo gave the charge sheet to Koleos to be forwarded to the Commanding General. Koleos later told Puleo that the charge sheet had been sent through channels, but Puleo subsequently found it in a waste basket. Cawman was never prosecuted.

As these disclosures were occurring, General Lynch was reviewing Healey's recommendation that Morgan receive only an NJP. However, Lynch rejected that recommendation and ordered yet another investigation. Consequently, the Article 32 hearing was reopened. Staff Sergeant Cummings testified for the government at the reopened hearing under a grant of immunity. As a result, new charges were brought against Morgan and a new charge sheet was prepared that contained the original charges plus two new ones.16 One of

_____

15. Anyone subject to the UCMJ may serve as an "accuser" and prefer charges against someone else. 10 U.S.C. S 801(9).

16. Under Article 32, the investigating officer may, subject to certain conditions, investigate other, uncharged offenses, if the evidence indicates that the accused may have committed those offenses. 10 U.S.C. S 832(d).

16

the new charges was an allegation that Morgan was engaging in an illegal bookmaking operation in RS Pittsburgh.

Following that reopened investigation, Major Healy prepared another report in which she noted that Cummings testified under a grant of immunity, that he had previously lied, and that he admitted to using cocaine while on recruiting duty. Healey also noted that the government called witnesses who negated Cummings' testimony against Morgan. Nonetheless, she recommended that Morgan be tried by general court-martial.17

H.

Morgan's general court-martial18 was scheduled for Tuesday, August 8, 1989, in Parris Island. However, one week before the scheduled trial, Koleos19 suggested to Puleo

_____

17. After Healey filed her second report, Morgan wrote to then Pennsylvania Senator John Heinz and complained about the conduct of the government, and the charges brought against him. That letter formed the substance of Morgan's "whistleblower" claim. However, the district court found that General Lynch did not know of the letter and that no action was taken against Morgan because of it. Thatfinding of fact is not clearly erroneous.

18. A general court-martial is the highest trial court in military law. Article 16 of the UCMJ, 10 U.S.C. S 816. Articles 22 through 29 of the UCMJ, 10 U.S.C. SS 822-29, establish the mechanics of convening a court-martial and the composition of its members. For a detailed discussion of the entire process, see SCHLUETER , supra note 9, SS 8-1 through 8-6.

19. Koleos had by this time been assigned to be the prosecutor for Morgan's general court-martial. In military jurisprudence, the prosecutor is called "trial counsel." HOMER E. MOYER, JR., JUSTICE AND THE MILITARY, S 2-306; 10 U.S.C. S 827(a)(1).

Koleos occupied a number of positions in this case. He was the Deputy Staff Judge Advocate for the Eastern Recruiting Region and the legal advisor to the Evans' investigation. At the request of Major Kelley, legal advisor to the Casey investigation, he interviewed Jerry Williams, the printer accused of printing false high school diplomas for applicants. Further, he was government counsel in Morgan's Article 32 investigation conducted by Major Healey.

17

that Morgan should opt for an Other Than Honorable ("OTH") discharge in lieu of a general court-martial.[20] Puleo declined the offer on behalf of his client. Koleos then asked Puleo if his position would be different if the government had a notebook in which Morgan had recorded his bookmaking. Cummings had allegedly taken this "gray book" from Morgan's car, and Koleos purportedly allowed Cummings to travel to Pittsburgh to retrieve it.

Later that week, on Thursday or Friday, Koleos told Puleo that Cummings was bringing the gray book to Parris Island for Morgan's court-martial. On Saturday, August 5, Koleos again told Puleo that Cummings had the gray book; but claimed that he did not know where Cummings was. That afternoon, Puleo went to Koleos' office. Koleos happened to be speaking to Cummings on the telephone when Puleo arrived, and Puleo told Koleos he wanted to speak with Cummings. However, as soon as Koleos finished his conversation he hung up the phone. Koleos told Puleo that Cummings was on his way to Parris Island with the gray book and that the offer to allow Morgan to take the OTH discharge was only open until Cummings and the gray book arrived at Parris Island.

On Monday morning, August 7, 1989, Puleo spoke to Koleos again about the gray book and Koleos indicated that Cummings had the gray book. Based on Koleos' representations about the gray book, Morgan decided to accept the government's offer of an OTH discharge in lieu of trial by general court-martial. Accordingly, Morgan submitted a request for administrative discharge under other than honorable conditions in lieu of a general court-martial. In the request, which he prepared with defense counsel Puleo, Morgan pleaded guilty to wrongfully participating in gambling activity while on duty as the Recruiting Instructor -- the least serious offense that Morgan had been charged with. General Lynch approved the request the same day. Consequently, Morgan was administratively reduced in rank to lance corporal with a

_____

20. The regulations of the various armed services permit an enlisted accused to apply for an administrative discharge rather than face a trial by court-martial. SCHLUETER, supra note 9, S 9-4.

18

corresponding reduction in pay, and he became ineligible to serve in the Marine Corps Reserve.

However, after the request for the OTH discharge was approved, Cummings informed Puleo that he did not have the gray book, that he never did have it, and that he had been in constant touch with Koleos the previous weekend. Cummings told Puleo that he had only stated that he was looking for the gray book, and denied ever telling Koleos that he actually had it. Cummings also told Puleo that Koleos had promised him a general discharge in exchange for his testimony against Morgan.

Thereupon, Puleo filed a motion to dismiss the charges against Morgan based on prosecutorial and governmental misconduct. Puleo based the motion upon the numerous attempts to falsely implicate Morgan by named Marines, including Koleos, and members of the Evans' investigation team, and the evidence of coercion and perjury that were part of that alleged scheme. However, the request to dismiss the charges against Morgan was denied.

Puleo also prepared a request for Morgan to withdraw his OTH discharge and that was submitted to General Lynch on April 9, 1989. The request was based on Morgan's prior reliance on the government's representations that it had the gray book in its possession, and his subsequent discovery that the government could not produce that evidence. If Morgan's request had been granted, his trial by general court-martial would have proceeded.[21]

_____

21. Under military criminal procedure, an accused must be tried within 120 days of the date the charges are preferred, pretrial restraint in the form of confinement, arrest or restriction in lieu of arrest or the accused
is brought on active duty. R.C.M. 707(a)(1), (2), (3). In Morgan's case, the
last day of his "speedy trial" time was August 8, 1989, the date of his scheduled trial. Puleo testified that he expected that Morgan's request to withdraw the OTH discharge would be treated as a defense delay, which would toll the speedy trial clock. R.C.M. 707(c). However, there is no indication that Morgan was willing to waive his speedy trial rights. Furthermore, the filing of the request would not by itself have stopped the clock from running. R.C.M. 707(c)(1) and Discussion. By August 9, 1989, Morgan's speedy trial time would have expired.

19

After Morgan submitted his request to withdraw the OTH discharge, the Staff Judge Advocate, Colonel Jones, interviewed Koleos and Puleo. On August 9, 1989, Jones sent a memo to General Lynch, recommending disapproval of Morgan's request. The memo states in part:

> 3. The evidence in question, a grey book consistin g of memorandum records of respondent's gambling transactions with customers, was never in the possession of government counsel nor was it ever represented to be so. The government counsel indicated to respondent's counsel that a government witness had taken the book from the respondent's vehicle in December, 1988, claimed that he possessed it, and was making efforts to bring it under the control and custody of the government counsel by the close of business of August 7, 1989.

> 4. Whether or not the representations of governmen t counsel were the causal factor in the submission of the request is speculative at best. It should be noted however, that the respondent did not indicate in his request for separation that he considered the book to be the dispositive factor in his decision to avoid trial by court-martial. Furthermore, the government was not relying upon its production to obtain a conviction but rather the testimony of six witnesses and other corroborative documentary evidence.

On August 9, 1898, General Lynch denied Morgan's request to withdraw the OTH discharge. He offered no explanation for doing so. That same day, General Lynch dismissed the charges against Morgan in light of the OTH discharge. On August 31, 1989, Morgan was discharged from the Marine Corps on an "other than honorable" basis. 22

_____

22. Following his discharge, Morgan sent a letter to Congressman Murtha complaining of his treatment. Morgan subsequently argued before the district court that his Constitutional rights were violated because the Marines retaliated against him for writing that letter. However, the district court properly rejected that argument as the letter was written after he had been discharged from the Marine Corps, and could not, therefore, have been the basis for any retaliation.

20

II.

In 1991, Morgan filed a complaint in the United States District Court for the Western District of Pennsylvania seeking declaratory and equitable relief against the Secretary of Defense, the Secretary of the Navy, the Commandant of the Marine Corps, and the Commanding General of Parris Island. The six counts of the Complaint alleged violations of the Constitution, including violations of free speech, cruel and unusual punishment,[23] equal protection and due process. The court rejected all but one of Morgan's claims[24] after a nonjury trial. The court did not

_____

23. Morgan did not pursue his eighth amendment claim at trial.

24. The following is a synopsis of each claim and of the district court's holding on each.

1. First Amendment Claim. -- Morgan claims he was a "whistleblower" who was retaliated against for blowing the whistle on recruiting fraud. However, the district court rejected this claim because it found the testimony of General Lynch credible. Thus, Lynch ordered Colonel Casey, to investigate and fix the RS Pittsburgh problem. Lynch testified that he did not know Morgan; that he was never informed that Morgan had complained about the problems in RS Pittsburgh to Master Sergeant Zuro; and that his investigation was not the result of any "whistleblowing" by Morgan. District Court Opinion, Conclusions of Law P 52.

2. Sixth Amendment right to counsel claim.-- Morgan claimed that he was mislead by Captain Evans into believing that Evans was an attorney and thus, his right to counsel was violated. Captain Evans indicated that he was a legal advisor and Morgan talked to Captain Evans for about 30 to 45 minutes. However, Captain Evans is not an attorney.

The district court rejected this claim by holding that Morgan failed to establish that he sustained any harm as a result of Evan's misrepresentation. Id. at P 53.

3. Claim under the Equal Protection component of the Fifth Amendment. -- Morgan claims that gambling is tolerated in the Marine Corps and, by preferring gambling charges against him, the government was engaging in selective prosecution. The district court rejected this selective prosecution claim by finding that, although gambling in the form of football pools, raffle tickets and the Pennsylvania Lottery took place in RS Pittsburgh, Morgan was not being prosecuted for this type of gambling. Rather, Morgan was being prosecuted for running a bookmaking operation at RS Pittsburgh. Id. at P 54.

discuss Morgan's claim that his right to substantive due process had been violated, but it did conclude that Koleos' conduct "during the week preceding [Morgan's] scheduled trial by general court-martial. . . ." had denied Morgan's right to due process of the law. Dist. Ct. Op. atP 55. The court wrote:

> Specifically, the court finds that Captain Koleos engaged in deceptive conduct in connection with the availability of Staff Sergeant Cummings and the availability of the government to gain possession of the gray book. The court further finds that such deception was improper, and that it was the determining factor in [Morgan's] decision to request an OTH discharge in lieu of trial by general court-martial, violating his right for an opportunity to be heard on the charges against him. Accordingly, [Morgan] is entitled to a declaratory judgment that defendants violated his right to procedural due process of law under the Fifth Amendment.

Id. The court also noted other allegations of misconduct alleged against Koleos and others, including the alleged attempts to falsely accuse Morgan of procuring fraudulent diplomas. However, the court was "unpersuaded that these incidents of misconduct were factors in [Morgan's] decision to request the OTH discharge. . . ." Thus, the district court "decline[d] to find that such misconduct also violated [Morgan's] Fifth Amendment right to due process." Id. at P 55 n.62.

Despite ruling in Morgan's favor on his procedural due process claim, the court concluded that it could give only limited relief. The court determined that it is"impracticable to vacate General Lynch's August 9, 1989 decision, which denied [Morgan's] request to withdraw his request for an OTH discharge, and to order the Marine Corps to proceed with [Morgan's] trial by general court-martial," as he had requested. Id. at P 56, The court also rejected Morgan's request for reinstatement in the Corps. "[I]t is undisputed that there is no vested property right in future reenlistment in the Marine Corps." Id.. The court reasoned that the Marines would not have permitted Morgan to reenlist upon the expiration of his last reenlistment period on February 5,

22

1990. Thus, the district court directed the Marines to reinstate Morgan for the limited period of time between August 31, 1989, the date of his OTH discharge, and February 5, 1990, the date of the expiration of his last reenlistment. Id. The Marine Corps was also directed to expunge Morgan's military records insofar as they reflected a reduction in rank and the OTH discharge, to restore him to his status as a Master Sergeant, and to recharacterize his discharge as honorable or general using the standards applicable to those discharged at the expiration of their normal term of service. Finally, the district court denied Morgan's claim for back pay under Hubbard v. Administrator, Environmental Protection Agency, 982 F.2d 531 (D.C.Cir. 1991), which held "that the waiver of sovereign immunity in Section 702 of the Administrative Procedure Act for `relief other than money damages' does not waive sovereign immunity for an award of backpay." Id.

III.

Morgan did not appeal the district court's merits decision. However, on September 28, 1995, he filed an application to the district court for an award of attorney's fees and costs under the Equal Access to Justice Act EAJA. Under the EAJA, a prevailing party25 in non-tort litigation against the United States is entitled to attorney's fees and costs, unless the court finds that the position taken by the government "was substantially justified or that special circumstances make an award unjust." 28 U.S.C. S 2412(D)(1)(A). In a Memorandum and Order, dated May 3, 1996, the district court found that the government's position was substantially justified and, denied Morgan's application for attorney's fees and costs. This appeal followed.

IV.

The district court's determination of substantial justification in a suit under the EAJA is reviewed for abuse

_____

25. The government concedes that Morgan is the prevailing party for purposes of the EAJA.

23

of discretion. Pierce v. Underwood, 487 U.S. 552, 560 (1988). An abuse of discretion arises when the district court's decision "rests upon a clearly erroneousfinding of fact, an errant conclusion of law or an improper application of law to fact." Hanover Potato Products, Inc. v. Shalala, 989 F.2d 123, 127 (3d Cir. 1993). An abuse of discretion can also occur "when no reasonable person would adopt the district court's view." Id. Therefore, we will not interfere with the district court's exercise of discretion"unless there is a definite and firm conviction that the court. . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Id. Finally, as a part of our abuse of discretion review, we examine the district court's factual findings for clear error. Id. Our task in this regard is more difficult because the factual underpinnings of the EAJA claim are not set forth in the district court's opinion denying fees and costs, but in its decision on the merits. There, the district court notes the numerous instances of conflicting testimony but makes very few findings of fact or credibility determinations. Although our task is thus complicated, the issue before us is sufficiently narrow that we can proceed with our analysis based upon our review of the record and the findings that the district court made along with those that are implicit in that court's decision.

V.

Although our inquiry must be controlled by the language of the statute in question, our analysis is aided by the Supreme Court's statement of the policy underlying the EAJA:

> Concerned that the Government, with its vast resources, could force citizens into acquiescing to adverse Government action, rather than vindicating their rights, simply by threatening them with costly litigation, Congress enacted the EAJA, waiving the United States' sovereign and general statutory immunity to fee awards and creating a limited exception to the `American Rule' against awarding attorneys fees to prevailing parties.

24

Pierce v. Underwood, 487 U.S. at 575 (Brennan, J., concurring in part and concurring in the judgment). The section of the EAJA applicable here[26] provides as follows:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. S 2412(d)(1)(A). "Fees" include "reasonable attorney fees." 28 U.S.C. S 2412 (d)(2)(A). The question of whether the position of the United States was "substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based)

_____

26. Morgan argues that his fee application can also be considered under section 2412(b) of the EAJA which provides:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing parties in any civil action brought by or against the United States or
> any agency or any official of the United States acting in his or her
> official capacity in any Court having jurisdiction of such action. The
> United States shall be liable for such fees and expenses to the extent that any other party would be liable under the common law or the terms of any statute which would specifically provide for such
> an award.

28 U.S.C. S 2412(b). This section of the EAJA does not relieve the government of liability for attorney's fees to the prevailing party even in a case where the government's position was substantially justified. However, it does require that the prevailing party identify some other statute or rule of common law which specifically provides for an award of attorney's fees. Morgan has not identified any such statute or rule of common law and, therefore, his argument that a fee award can be made under 2412(b) is without merit.

which is made in the civil action for which fees and other expenses are sought." 28 U.S.C. S 2412(d)(1)(B).

The Supreme Court has defined substantial justification under the EAJA as "justified in substance or in the main -- that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. at 565. That is to say, the government's position is substantially justified "if it has a reasonable basis in both law and fact." Hanover Potato Products, Inc. v. Shalala, 989 F.2d at 128. The government has the burden of establishing that there is substantial justification for its position. Id. at 128. In order to do so, the government must show: (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory it propounded; and (3) a reasonable connection between the facts alleged and the legal theory advanced. Id.

The government's position under the EAJA includes "not only the position taken in the litigation but the agency position that made the litigation necessary in thefirst place." Id. Thus, unless the government's pre-litigation and litigation positions have a reasonable basis in both law and fact, the government's position is not substantially justified. Id.; see also Taylor v. Heckler, 835 F.2d 1037, 1040 (3d Cir. 1988) ("[T]he government is deemed to have two positions for EAJA purposes, both [of which] must be substantially justified. . . . [I]f either government position does not bear scrutiny, the prevailing party should be awarded attorneys' fees [and other reasonable fees and expenses].").

VI.

In denying Morgan's fee application, the district court noted that Morgan raised six claims against the defendants alleging violations of the First, Fifth, Sixth, Eighth and Fourteenth Amendments and that the relief Morgan sought was (1) a declaration that the constitutional rights guaranteed under those provisions were violated; (2) an injunction providing for his reinstatement into the Marine Corps, with restitution of all financial losses and other benefits and the expungement of his record of his OTH discharge; (3) costs, expenses and attorneys fees; and (4)

other just and equitable relief. Dist. Ct. EAJA Opn. at 3. The district court then noted that Morgan prevailed on only one of his claims, i.e., that Koleos' conduct during the week preceding the scheduled court-martial violated his Fifth Amendment procedural due process rights, and failed to prove any of his other constitutional claims. Thus, "the relief awarded to plaintiff was very limited in relation to the requested relief." Id. at 12.

We must emphasize, however, that the limited nature of the relief fashioned by the district court does not in anyway obscure the seriousness of even the single instance of misconduct that the court found. Koleos was appointed to prosecute this matter for the Marine Corps. He conducted himself in a manner that violated rights afforded under the very constitution he had sworn to uphold as an attorney and as an officer in the Marine Corps.

The ABA Rules of Professional Conduct and the ABA Standards for Criminal Justice: Prosecution Function and Defense Function, are applicable to Marine Corps judge advocates. United States v. Pack, 9 M.J. 752, 754 (C.M.A. 1980). Rule 4.1 of the Rules of Professional Conduct requires that a lawyer "shall not knowingly . . . make a false statement of material fact . . . to a third person." MODEL RULES OF PROFESSIONAL CONDUCT Rule 4.1. A "third person" within the meaning of the rule includes opposing counsel. Id., Legal Background. Criminal Justice Standard 3-4.1 provides that it is "unprofessional conduct for a prosecutor knowingly to make false statements or representations in the course of plea discussions with defense counsel or the accused." STANDARDS FOR CRIMINAL JUSTICE: THE PROSECUTION FUNCTION, Standard 3-4.1. Accordingly, Koleos' fabrications about the gray book constituted a gross ethical violation of his duty and responsibility as a lawyer as well as government prosecutor. Koleos' conduct is also "conduct unbecoming an officer and a gentleman" which is prohibited by Article 133 of the UCMJ, 10 U.S.C. S 933.27 The military demands that its officers comport themselves in accordance with a strict moral standard, a deviation from which can be a

_____

27. See Parker v. Levy, 417 U.S. 733 (1974).

punishable offense under the UCMJ. See M.C.M., Part IV, P 59(c)(2). Counsel for the government in this appeal deems it advantageous to dwell upon Morgan's limited victory in its attempt to defeat his petition for fees under the EJAJ. However, Koleos' utter disregard for his duties and responsibilities as an attorney and as a commissioned officer, coupled with his contempt for the constitutional rights of Master Sergeant Morgan, affords the government little room to trumpet the limited scope of Morgan's victory. We are thus guided not by Koleos' misconduct, but by the extent to which the government's position in defending itself against Morgan's claim was substantially justified.

VII.

"[D]etermining whether the government's position is substantially justified for the resolution of an EAJA claim has proved to be an issue of considerable conceptual and practical difficulty." Roanoake River Basin Association v. Hudson, 991 F.2d 132, 138 (4th Cir. 1993). We cannot assume that the government must pay Morgan's attorney's fees merely because it did not successfully defend against Morgan's suit on the merits in its entirety. The EAJA is not a "loser pays" statute.28 Thus, a court cannot assume that the government's position was not substantially justified simply because the government lost on the merits. "[T]he inquiry into reasonableness for EAJA purposes may not be collapsed into [the] antecedent evaluation of the merits, for EAJA sets forth a distinct legal standard." Cooper v. United States Railroad Retirement Board, 24 F.3d 1414, 1416 (D.C. Cir. 1994). Furthermore, as previously noted, we must scrutinize both the government's prelitigation position and its litigation position. Both positions must be substantially

_____

28. It has been argued persuasively, however, that where the government acts in bad faith or acts dishonestly, the government's conduct "undermines the `substantial justification' for the government's position" and an award of attorney's fees should follow. Gregory C. Fisk, The Essentials of the Equal Access to Justice Act: Court Awards of Attorney's Fees for Unreasonable Government Conduct (Part Two) , 56 La. L. R. 1, 54 (1995). Fee-shifting in such a case is " `automatic' only in the circular sense that fee-shifting occurs automatically when the government acts unreasonably." Id. at 41.

justified and if either is not, attorney's fees should be awarded to the prevailing party.

A.

The usual conceptual difficulties inherent in resolving an EAJA claim are further complicated here because Morgan and the government have a fundamental disagreement over what the district court should have examined in determining whether the government's prelitigation position was substantially justified. Morgan argues that because he alleged a number of constitutional claims involving a number of military personnel, the district court "should have taken a broader view and consider[ed] not only General Lynch's decision, and subjective knowledge, but also that of his advisors and other government agents, especially the actions and intent of Captain Koleos, Morgan's Marine Corps prosecutor." Reply Br. at 2. Morgan would have us revisit his merits claim and consider whether General Lynch's decision was reasonable in light of all of the constitutional violations Morgan alleged in his complaint, including allegations of misconduct during the Evans' investigation, allegations against Cawman and allegations about the fabrication of William's statement. See Appellant's Br. at 23–34. In essence, Morgan argues that the district court ignored the numerous constitutional violations which caused him to file his civil action by limiting the focus of the EAJA inquiry to the reasonableness of General Lynch's decision, which only addressed Koleos' fabrications about the gray book.

Not unexpectedly, the government urges us to focus only upon General Lynch's reasons for refusing to allow Morgan to withdraw his request for the OTH discharge in lieu of court-martial. The government argues that we cannot look beyond Lynch's refusal and examine every instance of misconduct alleged by Morgan.

Although we have detailed some (though by no means all) of the allegations surrounding the Marine Corps investigation into recruiting fraud in RS Pittsburgh, the deceit purportedly perpetrated by Marine Corps personnel, and by Morgan himself, we do not suggest that this

29

backdrop controls our substantial justification analysis. Rather, as noted above, we state it only because it is impossible to understand Morgan's EJAJ petition in a vacuum.

The Marine Corps' investigation of Morgan had two parts. One involved recruiting fraud and one involved bookmaking charges. Koleos' misconduct in regard to the gray book, which the district court found was the decisive factor in Morgan's decision to opt for the OTH discharge, 29 has nothing to do with the recruiting fraud charges leveled against Morgan. In fact, Morgan was willing to be tried by the general court-martial until Koleos lead him to believe that the government had solid proof of Morgan's gambling activities in the form of the gray book. Once Morgan was informed that the government had his gray book, he requested an OTH discharge. And once he learned that Koleos did not have the gray book, he immediately attempted to withdraw that request. Further, Morgan did not plead guilty to any charge that arose from the recruiting fraud investigations. He did plead guilty to charges of bookmaking. Thus, we can not allow the government's conduct during the recruiting fraud investigations to guide our analysis of its position with regard to Morgan's requested discharge or his attempt to withdraw the request.30

Morgan also insists that Koleos' misconduct is relevant to determining substantial justification even if we focus solely

_____

29. Koleos also engaged in misconduct in the recruiting fraud aspect of the case when he misstated the results of his conversation with Williams, the printer, about Morgan's complicity in the scheme involving the preparation of false high school diplomas. However, the district court found that Koleos"s misconduct in regard to the Williams conversation was not relevant to Morgan's request for an OTH discharge. Dist. Ct. Opn. at P 55 n.62.

30. For a discussion of the extent to which the EAJA inquiry focuses only upon the narrow issue on which a party prevailed or upon the entire litigation of which that issue may have been only a small part, see Ronoake River Basin Associates v. Hudson et al. 991 F.2d 132 (4th Cir. 1993). There, the narrow issue that the prevailing party relied upon for its fee request under the EAJA had a much closer nexus to the government's overall action than the challenged action here.

upon Lynch's refusal to allow Morgan to withdraw his requested discharge. We disagree. Although we in no way minimize the gravity or impropriety of Koleos' conduct, it is clear to us that Koleos' conduct is not the issue before us. Rather, the issue is General Lynch's refusal to allow Morgan to withdraw his request of an OTH discharge and proceed to a general court martial. The fact that Morgan's request was triggered by Koleos' conduct does not elevate that conduct to the level of agency action under the facts before us nor transform his conduct into the decision that was challenged in court.[31] Morgan challenged General Lynch's decision, and that is the agency action that must be substantially justified[32] if Morgan is to be denied fees under the EAJA even though Koleos' conduct formed the basis of Morgan's relief in the district court. Therefore, the district court's exclusive focus on the reasonableness of General Lynch's decision was proper.[33]  After reviewing this

_____

31. We need not determine under what circumstances the unlawful actions or misconduct of an agency employee who is not responsible for the challenged action can amount to agency action for purposes of an EAJA fee petition. It has been held that, as general rule, an agency employee's unauthorized conduct, which is not subject to judicial review, cannot be regarded as agency action. Chiu v. United States, 948 F.2d 711, 716 (Fed. Cir. 1991). However, where the agency acts based upon the misconduct of its employee, agency action can be found. Id. (supervisory employee's unlawful motivation in recommending elimination of plaintiff 's government position was deemed agency action where the agency official implementing the reduction−in−force decision acted on supervisor's recommendation).

32. In opposing Morgan's fee application in the district court, the government argued not only that its position was substantially justified but also that special circumstances made a fee award unjust. However, the district court did not address the government's special circumstances argument because it found that the government's position was substantially justified. Dist. Ct. EAJA Op. at 5 n.3. In this appeal, the government is not arguing that special circumstances make a fee award unjust.

33. Had Lynch allowed Morgan to withdraw his OTH request, Morgan would have faced a general court martial where he could have raised all of the constitutional claims he litigated in the district court. Military tribunals have the same responsibilities to protect a person from constitutional violations as do federal courts. In re Kelly, 401 F.2d 211

31

record, we cannot say that the district court abused its discretion in finding that the government's prelitigation position (General Lynch's refusal to allow Morgan to withdraw his request for an OTH) was substantially justified.

The district court believed that General Lynch's reliance on Colonel Jones' recommendation was reasonable. Admittedly, Jones' report appears to contain a factual error. Jones wrote that "[w]hether or not the representations of government counsel were the causal factor in the submission of the request is speculative at best." Supp. App. at 33. However, it is obvious that Koleos' representations did cause Morgan to request discharge just as the district court concluded.

However, the district court's finding about Morgan's reasons for seeking to withdraw his request for the OTH discharge does not mean that either Jones or Lynch had to accept Morgan's explanation. Jones made his own credibility determination and Lynch relied on it. The fact that the district court made a different determination does not make Lynch's reliance on Jones' report unreasonable.

While General Lynch did not give any reason for denying Morgan's request, his testimony at trial suggests that his primary concern was avoiding the expense and inconvenience of flying witnesses to Parris Island for a court martial.

> When he first brought [the request for OTH discharge] in, . . . I was disinclined to approve it.
_____

(5th Cir. 1968). Simply stated, if Lynch had allowed Morgan to withdraw his OTH request, there would have been no district court litigation and no consequent EAJA fee application.

Further, Lynch's decision, made in his capacity as the Commanding General of the MCRD, Parris Island, is the agency action we are examining here. The Marine Corps is within the Department of the Navy, Neal v. Secretary of the Navy, 639 F.2d 1029, 1033 n.4 (3d Cir. 1981, and each branch of the military is an agency within the meaning of the Administrative Procedures Act, 5 U.S.C. S 551 et seq. See Id. at 1036 and Jaffee v. United States, 592 F.2d 712, 719 (3d Cir. 1979).

32

* * *

> Because I thought that justice would be better served
> if Master Sergeant Morgan stood trial by court-martial,
> . . .
>
>  And the point was made in general terms that if it
> went to court-martial, it would be a great expense to
> the government, we would probably have to bring
> witnesses in on a worldwide basis, and whatever, and
> we were serving the needs or requirements of justice
> just as well by acceding to Master Sergeant Morgan's
> request.
>
>  Having been convinced on that score, I then
> approved the request.

App. at 38. General Lynch also explained that he did not
allow Morgan to withdraw the OTH once it was granted
because "nothing had changed, nothing that is in terms of
what had prompted the initial decision to accept his
request had changed. There was discussion on this book,
this gambling book." App. at 40. Lynch added:"Any
decision to do anything other than continue on the course,
we were going, would have had to have been influenced by
a change in circumstances and there was no change." App.
at 41.

We must disagree that "nothing had changed." Morgan
had learned that the government did not have his gray
book, and apparently believed that the Corps' case against
him was seriously compromised without it. Furthermore,
when Morgan sought to withdraw his request for the OTH
discharge, Lynch knew that Koleos had been accused of
misconduct and he knew that the government did not have
the gray book in its possession. App. at 40, 105. However,
Lynch's erroneous belief that "nothing had changed" does
not compel a finding that denial of Morgan's request was
without substantial justification. The government's
"position can be justified even though it is not correct."
Pierce v. Underwood, 487 U.S. at 566 n.2.

When Morgan sought to withdraw his request for the
OTH discharge and proceed to trial by general court
martial, he never recanted his admission of guilt. He never

33

claimed that he was innocent of the gambling charge. 34 Morgan had the benefit of defense counsel when he made the admission in his request for an OTH discharge. Moreover, the wording of his request to withdraw his OTH discharge reaffirms that evidence existed that would prove that he was guilty of the gambling offense to which he had pleaded guilty. When Morgan learned that the government did not have the gray book, he decided that he wanted to force the Marine Corps to conduct a general court-martial to determine the truth of the gambling charge as well as the other charges against him. He was willing to risk that the government could not prove the gambling charge without the gray book, and the other charges against him were based in large part upon testimony that had since been recanted, and witnesses who were either biased, or who were willing to testify that they had been coerced into falsely accusing him of various recruiting irregularities.

Since Morgan never sought to withdraw his admission of guilt, Lynch's belief that the ends of justice would be served by simply accepting the still pending admission of guilt and giving Morgan the OTH discharge that he requested a day earlier was eminently reasonable. Accordingly, the district court's finding that the government's prelitigation position was substantially justified was not an abuse of discretion.35

_____

34. Although Morgan claimed that the gray book never existed, that claim is not credible. See Dist. Ct. EAJA Opn. at 11 n.5. Had there been no gray book, Morgan would not have been persuaded to request the OTH discharge when Puleo told him of Koleos' representation that the government had such a book.

35. We also note that Morgan's request to rescind his requested OTH was submitted to General Lynch on August 8, 1989. Under the UCMJ, the military had 120 days to bring Morgan to court martial. See note 21 supra. August 8th was the last possible day that he could have been tried consistent with that limitation. Although Captain Puleo testified that he assumed that the request to withdraw the OTH discharge and proceed to court martial would act as a waiver of Morgan's "speedy trial" rights, Morgan did not waive those rights in the request he submitted on August 9. However, since General Lynch was apparently unaware of this possible legal hurdle, it is not a factor in our analysis.

34

B.

Morgan argues that the government's repeated attacks on the jurisdiction of the district court in his merits suit demonstrate the complete lack of justification for the government's litigation position. We disagree. The government argued that Morgan's complaint failed to assert any waiver of its sovereign immunity. Absent such waiver, Morgan could not bring an action against his superior officers.

In its EAJA opinion, district court indicated that its jurisdiction to hear Morgan's claims was "far from clear and presented a close question of law" and noted that the jurisdictional issue presented a "substantial question of law." Dist. Ct. EAJA Opn. at 6 and n.4. Further, the district court noted that "government counsel would have been remiss in not strenuously pursuing its argument that[the] court lacked jurisdiction to hear [Morgan's] claims." Id. at 6 n.4.

Ultimately, that court held that it had jurisdiction over Morgan's claims under Section 702 of the Administrative Procedures Act ("APA"), 5 U.S.C. S 702. 36 See Jaffee v.

_____

36. Section 702 of the APA provides as follows:

    A person suffering legal wrong because of agency action, or
    adversely affected or aggrieved by agency action within the meaning
    of a relevant statute, is entitled to judicial review thereof. An
action
    in a court of the United States seeking relief other than money
    damages and stating a claim that an agency or an officer or
    employee thereof acted or failed to act in an official capacity or
    under color of legal authority shall not be dismissed nor relief
    therein be denied on the ground that it is against the United
States
    or that the United States is an indispensable party. The United
    States may be named as a defendant in any such action, and a
    judgment or decree may be entered against the United States:
    Provided, That any mandatory or injunctive decree shall specify the
    Federal officer or officers (by name or by title), and their
successors
    in office, personally responsible for compliance. Nothing herein
(1)
    affects other limitations on judicial review or the power or duty
of
    the court to dismiss any action or deny relief on any other
    appropriate legal or equitable ground; or (2) confers authority to
    grant relief if any other statute that grants consent to suit
expressly

or impliedly forbids the relief which is sought.
5 U.S.C. S 702.

United States, 592 F.2d 712, 719 (3d Cir. 1979). However, in its EAJA opinion the district court expressly noted that Morgan "exacerbated the jurisdictional controversy by failing to allege the appropriate waiver of sovereign immunity under the APA" in his complaint or subsequent filings and that Morgan "specifically disregarded the court's specific instruction to file an amended complaint alleging the appropriate waiver of sovereign immunity under the APA." EAJA Op. at 6.

Even if we disagreed with the district court's assessment of the difficulty of the jurisdictional issue, we cannot conclude that the government's actions in challenging jurisdiction were unreasonable, especially in light of Morgan's failure to plead a waiver of sovereign immunity. Moreover, although Morgan argues that jurisdiction was clear from the very beginning and that the challenges to jurisdiction were therefore unreasonable, he was given an opportunity to clarify any jurisdictional uncertainty when the district court instructed him to amend his complaint to plead waiver under the APA. Consequently, we believe that the government's litigation position was substantially justified.

VIII.

Our holding that the government's position in the underlying litigation was substantially justified and that the denial of attorney's fees was appropriate does not end our inquiry. Morgan argues that he is entitled to costs under the EAJA even if he is not entitled to attorney's fees, and in support of that argument he relies on Section 2412(a)(1) of the EAJA which provides, in relevant part, as follows:

> Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.

36

28 U.S.C. S 2412(a)(1). He notes that, unlikeS 2412(d)(1)(A), which requires a finding that the government's position was not substantially justified before a district court can award attorney's fees, S 2412(a)(1) does not require such a finding as a condition to the award of costs. Thus, he argues that because he was the prevailing party, he is entitled to costs without regard to the reasonableness of the government's position in defending against his claims.

However, we do not believe it necessary to reach the merits of Morgan's argument. Section 2412(a)(1) specifically refers to costs as enumerated in 28 U.S.C. S 1920, which provides as follows:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.
>
> A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

28 U.S.C. S 1920 (emphasis added). It is clear that such costs are an incident of judgment. Rude v. Buchhalter, 286 U.S. 451, 459 (1931); see also Fed.R.Civ.P. 54.

Morgan inserted a prayer for costs in his complaint, but the district court did not address it in its merits disposition. See App. at 410-11. The award or non-award of costs is inherent to, and appealable from, the initial judgment. See Gonzales v. Fairfax-Brewster School, Inc., 569 F.2d 1294 (4th Cir. 1978). However, Morgan did not appeal from any part of the district court's merits decision. Consequently, his failure to appeal from the district court's failure to

37

award costs makes that aspect of the judgment afinal decision which Morgan cannot now attack. Id. at 1297.

IX.

In closing, we wish to reiterate that although we affirm the denial of relief to Morgan under the EJAJ, we do not intend to minimize the seriousness of the misconduct that has been attributed to Captain Koleos, or various other Marine Corps officers, nor do we minimize or ignore the seriousness of the allegations of violations of Morgan's constitutional rights. Indeed, in the usual case, a constitutional violation will preclude a finding that the government's conduct was substantially justified. See U.S. v. $12,248 U.S. Currency, 957 F.2d 1513, 1517 (9th Cir. 1991) ("[T]he government's position was not substantially justified because the government violated the claimant's Fifth Amendment Due Process rights . . ."). Rather, we merely state, that on this record, the district court did not abuse its discretion in finding the government's position was substantially justified. Thus, for all of the above reasons, we will affirm the decision of the district court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

38