

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-5-2001

# Kiareldeen v. Atty Gen USA

Precedential or Non-Precedential:

Docket 00-1823

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Kiareldeen v. Atty Gen USA" (2001). *2001 Decisions.* Paper 281.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/281

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 5, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1823

HANY MAHMOUD KIARELDEEN

v.

JOHN ASHCROFT, Attorney General; IMMIGRATION AND
NATURALIZATION SERVICE; PAUL SCHMIDT, Chair,
Board of Immigration Appeals; KEVIN D. ROONEY, Acting
Commissioner, Immigration and Naturalization Service;
ANDREA QUARANTILLO, District Director, Newark, INS;
RALPH GREEN, Warden Hudson County
Correctional Center,

      Appellants

Appeal from the United States District Court
for the District of New Jersey
District Judge: William H. Walls
(D.C. Civil No. 99-03925)

Submitted under Third Circuit LAR 34.1(a)
September 10, 2001

Before: MANSMANN, RENDELL and ALDISERT,
Circuit Judges.

(Filed: December 5, 2001)

STUART E. SCHIFFER, Acting
 Assistant Attorney General
MICHAEL P. LINDEMANN, Assistant
 Director
DOUGLAS E. GINSBURG, Attorney
LYLE D. JENTZER, Attorney
Office of Immigration Litigation
Civil Division, Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

JAMES B. CLARK, III
Office of United States Attorney
970 Broad Street
Room 700
Newark, N.J. 07102

 ATTORNEYS FOR APPELLANTS

DAVID D. COLE
Counsel, Center for Constitutional
 Rights
c/o Georgetown University
 Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001

NANCY CHANG
Center for Constitutional Rights
666 Broadway -- 7th Floor
New York, NY 10012

REGIS FERNANDEZ
744 Broad Street
Suite 1807
Newark, N.J. 07102

HOUEIDA SAAD
Blue Cross and Blue Shield
 Association
1310 G Street, NW
Washington, D.C. 20005

 ATTORNEYS FOR APPELLEE

        DANIEL J. POPEO
        RICHARD A. SAMP
        Washington Legal Foundation
        2009 Massachusetts Avenue, NW
        Washington, D.C. 20036

        WASHINGTON LEGAL FOUNDATION;
        U.S. REPRESENTATIVES
        SHERWOOD BOEHLERT, J.D.
        HAYWORTH, LAMAR SMITH, AND
        JOHN E. SWEENEY; U.S. SENATOR
        JESSE HELMS; ALLIED
        EDUCATIONAL FOUNDATION;
        STEPHEN FLATOW; GRAND LODGE
        FRATERNAL ORDER OF POLICE;
        and the JEWISH INSTITUTE FOR
        NATIONAL SECURITY AFFAIRS as
        Amici Curiae in support of
        Appellants Seeking Reversal.

OPINION OF THE COURT

ALDISERT, Circuit Judge.

In the course of proceedings to remove Appellee Hany Mahmoud Kiareldeen, an ethnic Palestinian and Israeli citizen, from the United States, the Immigration and Naturalization Service ("INS") relied on classified evidence obtained by the FBI's Joint Terrorism Task Force. This evidence suggested that Appellee was a member of a terrorist organization, was involved in the 1993 bombing of the World Trade Center and had made threats against Attorney General Janet Reno.

After numerous administrative hearings, stays and appeals, the district court granted Kiareldeen a writ of habeas corpus, reasoning that the INS had not sufficiently proved its case against him to justify its actions during removal proceedings. The court later awarded him $110,743.06 in attorney fees under the Equal Access to Justice Act ("EAJA"), determining that the INS's detention, and litigation in support of the detention, were not

3

substantially justified. The Attorney General and the INS now appeal the grant of attorneys' fees. We reverse the judgment.

The EAJA provides that "a court shall award to a prevailing party other than the United States fees and other expenses . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. SS 2412(d)(1)(A); see also Comm'r, INS v. Jean, 496 U.S. 154, 159-160 (1990). The government must meet this threshold twice. First, it must independently establish that the agency action giving rise to the litigation was substantially justified. Second, it must establish that its litigation positions were substantially justified. See id. See also Natural Resources Defense Council, Inc. v. EPA , 703 F.2d 700, 708 (3d Cir. 1983). The principal argument advanced by the government is that its position during removal proceedings was substantially justified. We hold that it was, and reverse the district court's grant of attorneys' fees.

Although the government originally took the position that the district court lacked jurisdiction to hear this case, that court assumed jurisdiction under 28 U.S.C. S 2241. We have jurisdiction to review the government's appeal of the district court's final order granting attorneys' fees pursuant to 28 U.S.C. S 1291.

This court reviews a district court's determination of no substantial justification in an EAJA suit for abuse of discretion. See Morgan v. Perry, 142 F.3d 670, 682-683 (3d Cir. 1998) (citing Pierce v. Underwood, 487 U.S. 552, 558-563 (1988)); cert. denied, 525 U.S. 1070 (1999). This court will not interfere with a district court's exercise of discretion "unless there is a definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Morgan, 142 F.3d at 683.

However, we may find an abuse of discretion "when no reasonable person would adopt the district court's view" or "when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an

4

improper application of law to fact." Id. at 682–683. This court will also "review an award [of attorneys' fees] de novo insofar as it rests on conclusions of law, such as an interpretation of the statutory terms that define eligibility for an award." Nat'l Ass'n of Mfrs. v. Dep't of Labor, 159 F.3d 597, 599 (D.C. Cir. 1998) (citing Love v. Reilly, 924 F.2d 1492, 1493 (9th Cir. 1991)); see also Friends of Boundary Waters Wilderness v. Thomas, 53 F.3d 881, 885 (8th Cir. 1995) (holding that when the abuse of discretion standard is applied in an EAJA case, the district court's conclusions of law are still reviewed de novo ).

I.

Kiareldeen entered the United States on a student visa on April 27, 1990. He then violated the specific terms of his visa by remaining in the United States after completing his studies in 1994. On March 26, 1998, the INS served him with a Notice to Appear charging that he was removable under S 237(a)(1)(C)(i) of the Immigration and Nationality Act ("INA") for failing to comply with the terms of his visa. The service ordered him held without bond pending the outcome of his deportation hearing.

On April 27, 1998, an immigration judge denied bond and scheduled a removal hearing. On May 22, 1998, Kiareldeen conceded that he violated the terms of his visa, and then sought an adjustment of status based upon INA S 245 (marriage to a United States citizen). The INS resisted the adjustment of status with evidence that Kiareldeen had filed a false birth certificate with the immigration judge. The INS also submitted classified evidence to the immigration judge, in camera and ex parte, alleging that (1) Kiareldeen was a member of a foreign terrorist organization, (2) he was involved in a meeting planning the 1993 attack on the World Trade Center one week prior to the actual attack, at which a suicide bombing was discussed, and (3) he later threatened to kill Attorney General Janet Reno for her role in convicting those responsible for the 1993 bombing of the World Trade Center.

The INS provided Kiareldeen with several unclassified summaries of the classified evidence of the Federal Bureau

5

of Investigation ("FBI"). The summary dated July 29, 1998, stated that the information was obtained by the Joint Terrorism Task Force, an FBI-supervised squad with detailed representation from numerous law enforcement agencies that work together on terrorism matters in the Newark, New Jersey area. The summary stated also that the information gathered was foreign intelligence information based on multiple sources, which the FBI considered to be reliable, and that the FBI had taken "additional steps to test the veracity of the source reporting the threat against the Attorney General." App. Vol. II at 25–28. It emphasized that the reliability of the sources "is of fundamental concern to the FBI" and that the characterization of the reporting "is controlled by guidelines set forth in the National Foreign Intelligence Program Manual." Id. at 25. Finally, it explained that this type of information regarding terrorist investigations is"classified to protect against disclosure that would permit a terrorist or suspected terrorist organization, group, or individual to avoid preventive or detection measures, or would reveal FBI or other intelligence agency sources and methods by which such information is obtained." Id. at 26.

Kiareldeen responded to the accusations with character witness testimony from family and friends, as well as other evidence seeking to rebut the claims in the unclassified summaries. On April 2, 1999, the immigration judge granted his application for adjustment of status, awarded conditional permanent resident status and released him on bail. That same day, the INS appealed the decision to the Board of Immigration Appeals ("Board"), which then issued a stay of the release order.

Kiareldeen appealed the temporary stay, but the Board denied the motion. It stated that Kiareldeen's "use of a fraudulent birth certificate in conjunction with his application for adjustment of status . . . [is a] serious matter . . . [which] casts doubt on [Kiareldeen's] credibility and on the credibility of the evidence he submitted." Id. at 62. The Board further found that the INS was likely to prevail on its appeal, and that "there [are] sufficient reason[s] to believe that the respondent would be a threat to the national security . . . such that we find the

6

respondent ineligible for bond." Id. Kiareldeen also filed a petition for a writ of habeas corpus in the district court challenging the government's use of classified evidence to detain him, which was also denied.

On October 15, 1999, a separate panel of the Board issued a decision on the merits of the case granting the adjustment of status. Because of this, the prior Board panel lifted the stay on the release order and bond appeal. On October 20, 1999, the district court issued an Opinion and Order finding 8 U.S.C. S 1229a(b)(4)(B) unconstitutional as applied and ordering Kiareldeen's release. See Kiareldeen v. Reno, 71 F. Supp. 2d 402, 414 (D.N.J. 1999). It held that Kiareldeen's due process rights were violated by the government's reliance on classified information, which denied him both meaningful notice and an opportunity to confront the evidence. Later that day, the Board panel considering his bond ordered his release.

The following day, the INS filed a notice of appeal and sought an emergency stay from this court. A single judge issued a stay of execution pending further action by a motions panel. On October 25, 1999, the INS released Kiareldeen, withdrew its stay motion and decided not to pursue further appeals on the merits of the habeas corpus decision. On October 28, 1999, we denied the INS's motion to vacate the district court decision.

In addition to ordering Kiareldeen's release, the district court also ordered the government to pay attorneys' fees and costs. See id. at 419. The court later vacated this part of the order, after which Kiareldeen petitioned for fees and costs under the EAJA. See generally 28 U.S.C. S 2412. On April 11, 2000, the court ordered the government to pay Kiareldeen $110,743.06 in attorneys' fees and costs. See Kiareldeen v. Reno, 92 F. Supp. 2d 403, 409 (D.N.J. 2000). The government now appeals the decision to award fees, arguing that the district court abused its discretion in determining that there was no substantial justification for the INS's actions against Kiareldeen.

II.

We vigorously emphasize that the issue before us is solely the grant of attorneys' fees and costs. We are not reviewing

7

the merits of the decisions in the administrative proceedings or in the district court. It is necessary to make this strong statement because the tenor of the briefs submitted by the parties seems to concentrate on the merits of the decision granting the writ of habeas corpus, instead of on the much more limited issue of the attorneys' fee award. Our responsibility, therefore, is extremely limited. We must review the record and determine whether, in opposing Kiareldeen's various contentions in the removal and habeas corpus proceedings, "the position of the United States was [not] substantially justified." 28 U.S.C. SS 2412(d)(1)(A).

A.

The government argues first that it was justified in seeking Kiareldeen's removal from the United States because of the evidence presented by the FBI's Joint Terrorism Task Force. This evidence alleged that Kiareldeen was a member of a foreign terrorist organization, that he was involved in a meeting planning the 1993 bombing of the World Trade Center one week prior to the actual attack and that he later threatened to kill Attorney General Janet Reno for her role in convicting those responsible for the bombing. In prosecuting its case, the government relied on the alleged statements of Nidal Ayyad and Sheikh Omar Abdel Rahman in order to implicate Kiareldeen in the 1993 bombing.

The major position asserted by Kiareldeen in the habeas corpus proceeding was that he had been unlawfully detained by the INS on the basis of classified information that was not disclosed to him for national security reasons. The government contends that it had a duty to oppose Kiareldeen's position challenging the constitutionality of 8 U.S.C. S 1229a(b)(4)(B) as it was applied to him. The statute provides in relevant part:

> The alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such

8

national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this chapter.

8 U.S.C. S 1229a(b)(4)(B).

B.

Kiareldeen argues that his detainment was unlawful because it was based solely upon classified evidence. He argues that he was deprived of the "most basic elements of due process--meaningful notice of the evidence used against him and an opportunity to confront it." Appellee's Brief at 18-19. He also argues that "[t]he lack of substantial justification for the government's pre-litigation conduct is further buttressed by the exclusively hearsay character of the evidence it relied upon to detain Kiareldeen." Id. at 24. Kiareldeen further argues that he was not challenging the constitutionality of a statute, but simply the constitutionality of applying 8 U.S.C. S 1229a(b)(4)(B) to his particular case.

We are persuaded that Appellee's contentions, whatever force they may have had in influencing the ultimate administrative decisions and the district court judgment, are insufficient to demonstrate that the government's position either before or during litigation proceedings were not substantially justified.

III.

As the government's arguments are fact specific, we find it useful to consider the Appellee's contentions first.

A.

Kiareldeen vigorously argues that his detention, based primarily upon classified evidence, denied him the due process rights of meaningful notice and opportunity to respond. However, the favorable outcomes in both the administrative and district court proceedings severely dilute the efficacy of this contention. Kiareldeen was provided with

9

several unclassified summaries of the information the INS had submitted to the immigration judge. Though these summaries were not highly fact-specific, ensuring that neither the FBI's sources nor national security were compromised, they did provide him with the "who," "what," "when" and "where" of the allegations against him. Armed with this information, he then presented a considerable amount of live testimony and documentary evidence to the accusations.

These unclassified summaries were apparently informative enough that he was even able to surmise the identity of one of the FBI's informants--his ex-wife, an individual who was "a potentially crucial source of government information." Kiareldeen v. Reno , 92 F. Supp. 2d. at 408. She had previously levied allegations of domestic violence, child abuse and terrorism against him. Because she now refused to answer Kiareldeen's questions in court, ostensibly out of fear for her own safety, the court offered him the opportunity to submit written interrogatories to her. Kiareldeen chose not to do so.

Although Kiareldeen argues that the information provided him was not detailed enough to adequately respond, the result obtained from the hearings belies that claim. In the end, he mounted a successful defense to the government's case, winning his case at both the administrative and district court levels. He was released from detention, and then was granted an adjustment of status. In light of this favorable outcome, it seems rather disingenuous to now assert that the classified summaries the government provided were insufficient to adequately respond to the allegations.

B.

Kiareldeen argues that the government denied him due process because it relied on hearsay evidence without first establishing that the original declarants were unavailable for testimony. Putting aside what seems to be obvious--it is difficult to claim a deprivation of due process of law when one has been totally victorious in the various administrative and judicial proceedings--the simple response to this

10

contention is that hearsay evidence is, in fact, admissible in removal proceedings. Though the hearsay nature of evidence certainly affects the weight it is accorded, it does not prevent its admissibility in immigration cases. See Cunanan v. INS, 856 F.2d 1373, 1374 (9th Cir. 1988); Martin-Mendoza v. INS, 499 F.2d 918, 921 (9th Cir. 1974); Matter of Grijalva, 19 I. & N. 713, 721-722 (BIA 1988). In INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), the Court recognized that a hearsay document (INS Form I-213) typically constitutes the exclusive basis for a decision made in a removal proceeding.

C.

Although Kiareldeen now insists that his case did not challenge the constitutionality of any statute, his habeas petition made the following assertions: (1) his detainment without bond, which was based on classified evidence, was not authorized by the INA; (2) his detention violated the Due Process Clause of the Constitution because it was based on classified evidence, and thus "deprived him of adequate notice and a meaningful opportunity to defend himself "; and (3) his detention violated the Fifth Amendment to the Constitution because the INS failed to produce a witness. We agree with the government that in this light, Kiareldeen's allegations that he did not"challenge the facial constitutionality of any statute" are somewhat specious. Appellee's Brief at 26.

Section 1229a(b)(4)(B) specifically denies an alien the opportunity "to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief . . ." Although bond and deportation proceedings are adjudicated separately, pursuant to 8 C.F.R. S 3.19(d), "[d]etention is necessarily a part of [the] deportation procedure." Carlson v. Landon, 342 U.S. 524, 538 (1952). Because Kiareldeen's brief challenges the general use of classified information, his assertions necessarily challenge the constitutionality of the federal statute. We conclude that the Justice Department is duty-bound to defend what Congress has enacted, and was

11

therefore substantially justified in defending the constitutionality of this statute.

IV.

We turn now to the government's argument that because the "position of the United States was substantially justified," the award of attorneys' fees should be reversed. 28 U.S.C. SS 2412(d)(1)(A), (d)(2)(D).

A.

The government argues that, as a general rule, defense of a congressional statute "will usually be substantially justified." League of Women Voters of California v. F.C.C., 798 F.2d 1255, 1259 (9th Cir. 1986); see also Grace v. Burger, 763 F.2d 457, 458 n.5 (D.C. Cir. 1985) (explaining that Congress has a duty to self-police its measures for compatibility with the Constitution, and thus situations in which its defense of a statute is not substantially justified should be exceptional).

This general rule is a product of two constitutional norms: (1) the Executive Branch has an obligation to "take Care that the Laws be faithfully executed," U.S. Const., art. II, S 3, and (2) those laws enjoy a presumption of constitutionality in court. See Rostker v. Goldberg, 453 U.S. 57, 64 (1981). In enacting the EAJA, it is implausible that Congress intended to penalize the government for defending the constitutionality of its own enactments through the imposition of attorney fee liability.

The government argues that it has a duty to defend the constitutionality of statutes, including amendments to the INA, which Congress enacted in 1996. The INA governs the procedure used by the INS in removal proceedings. It declares that an alien's statutory right to examine the evidence against him in a removal proceeding does not entitle him "to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under [the Act]." 8 U.S.C. S 1229a(b)(4)(B). This particular provision of the INA

12

codified two previous cases which upheld the use of classified evidence to both oppose admissions and deny discretionary relief applications. See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206 (1953) (holding that the Attorney General cannot be compelled to disclose evidence used to exclude an alien); United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950) (upholding a regulation providing for summary exclusion without a hearing for an alien deemed to be a security risk).

Kiareldeen responds to the government's argument by challenging the constitutionality of the use of classified evidence generally. He emphasizes that "[n]o court that has subjected the INS's use of secret evidence to the modern due process analysis set forth in Mathews v. Eldridge, 424 U.S. 319 (1976), has found its constitutionality even to be a close question." Appellee's Brief at 15. He relies on two decisions for the proposition that the INS's use of classified evidence is unconstitutional per se. See Rafeedie v. INS, 880 F.2d 506 (D.C. Cir. 1989); American-Arab Anti-Discrimination Comm. v. Reno, 70 F.3d 1045 (9th Cir. 1995) ("AADC").[1] He emphasizes also that in both of these cases the INS abandoned appeals available to it, and was later ordered to pay attorneys' fees under the EAJA.

Although this addresses the merits of the district court's decision, it is simply beside the point. The propriety vel non of the district court's treatment of this constitutional argument is not before us, nor is it relevant to the appeal at hand. Because the appeal from the habeas corpus decision was withdrawn, that issue is still an open question in this court. What is relevant, however, is whether the government was substantially justified in defending the constitutionality of the statute Kiareldeen attacks. We hold that the government was obliged to do exactly that.

B.

The INS provided Kiareldeen with several unclassified summaries of the classified evidence. The summary

_____

1. Since vacated by the Court in Reno v. American-Arab Anti-Discrimination Committee, 524 U.S. 471 (1999).

13

provided on July 29, 1998 stated that it was comprised of information obtained by the FBI's Joint Terrorism Task Force. It explained that this information concerning terrorist investigations is "classified to protect against disclosure that would permit a terrorist or suspected terrorist organization, group, or individual to avoid preventive or detection measures, or would reveal FBI or other intelligence agency sources and methods by which such information is obtained." App. Vol. II at 26.2 Indeed, with each subsequent summary the government provided Kiareldeen, it appears to have been making a concerted

_____

2. The July 29, 1998 communication which the FBI provided Kiareldeen stated the following:

The information in this communication was obtained from multiple reliable sources who have provided reliable information in the past.

The Joint Terrorism Task Force (JTTF) is an FBI supervised squad with detailed representation from numerous law enforcement agencies that work jointly on terrorism matters in the Newark, New Jersey area.

This document contains information obtained by the Federal Bureau of Investigation pursuant to its investigatory powers as governed by the Attorney General Guidelines for FBI Foreign Intelligence Collection and Foreign Counterintelligence Investigations, dated June 8, 1995. These guidelines are established by the Attorney General to govern all investigations of international terrorism conducted by the FBI pursuant to Executive Order 12333.

The majority of information collected pursuant to these guidelines is foreign intelligence information and is classified national security information as defined by Executive Order 12958. Certain information which would otherwise be unclassified when standing alone, such as the fact that an organization has been designated by the United States Secretary of State as a terrorist organization, may require classification when combined with or associated with other unclassified or classified information. Additionally, when presented in a context that would reveal the FBI's investigative interest in certain individuals, organizations, or countries, information which would normally be unclassified may be properly classified.

Reliability of source information is of fundamental concern to the FBI as it becomes the intelligence base of FBI investigations. Characterization of FBI asset reporting is controlled by guidelines set forth in the National Foreign Intelligence Program Manual.

14

effort to divulge as much information as possible to assist
_____

"National security" as defined in Executive Order 12958, section 1.1(a),
refers to the national defense or foreign relations of the United States.
Investigation of international terrorism is necessary to the national
security. Counter terrorism investigations are primarily intended to
prevent harm to U.S. persons and U.S. interests, but also are designed
to prevent harm generally. In conducting counter terrorism
investigations, the FBI seeks information dealing with, but not limited
to:
(1) individuals, groups, or organizations who are or may be engaged in
terrorist activities; (2) recruitment of targets by individuals or
organizations who are or may be engaged in terrorist activities; (3) the
organizational structure of terrorist and suspected terrorist
organizations
or groups of individuals; (4) methods of procurement and training
employed by terrorist and suspected terrorist organizations or groups
and individuals; (5) operational and financial plans and techniques of
terrorist and suspected terrorist organizations or groups and individuals,
including fund-raising; (6) methods of communication by terrorist and
suspected terrorist organizations or groups and individuals; and (7)
information needed to protect the safety of any persons or organizations,
including those who are targets, victims or hostages of international
terrorist organizations. Collection of this and similar information is
essential to the FBI's ability to identify and counteract threats to the
national security. Non-public information collected pursuant to
international terrorism investigations is classified to protect against
disclosure that would permit a terrorist or suspected terrorist
organization, group, or individual to avoid preventive or detection
measures, or would reveal FBI or other intelligence agency sources and
methods by which such information is obtained.

HANY KIARELDEEN is a native of Israel who was born in Zaytoun, in
the Gaza Strip on January 30, 1968.

The JTTF of the FBI Newark Division developed information that Hany
Kiareldeen is a suspected member of a terrorist organization. Information
has disclosed Kiareldeen maintains relationships with other members
and/or suspected members of terrorist organizations dedicated to
committing acts of violence against the people of the United States or its
allies.

A source advised that approximately one week before the bombing of
the World Trade Center (WTC) in New York, Kiareldeen was present at a
meeting with several individuals who were talking about plans to bomb
the WTC. The meeting took place at Kiareldeen's residence in Nutley,
New Jersey. According to a source, Nidal Ayyad (Ayyad) was present at
this meeting (Ayyad is a convicted co-conspirator in the WTC bombing).
Ayyad did most of the talking about bombing the WTC as the others

15

him in his defense, without disclosing information in a way that could potentially compromise national security.

Information contained in the unclassified summaries was ultimately sufficient to assist Kiareldeen in mounting a defense to the allegations. However, the same information proved insufficient to both the immigration judge and the district court. Although accepting the JTTF summaries as "expert evidence," the immigration judge determined that the INS's lack of testimony, both public and in camera, was insufficient to counter Kiareldeen's evidence. App. Vol. II at 43. The district court, however, attacked the credibility of the summaries directly, describing them as "lacking in either detail or attribution to reliable sources." Kiareldeen v. Reno, 71 F. Supp. 2d at 414. That the FBI would be unwilling to compromise national security by revealing its undercover sources, is both understandable and comforting. That a court would then choose to criticize the FBI for being unwilling to risk undermining its covert operations against terrorists is somewhat unnerving.

The district court also criticized the government for its apparent unwillingness to also bring criminal charges against Kiareldeen.3 It stated that "even the government
_____

listened. Ayyad stated that he suggested to Sheikh Omar Abdel Rahman (Rahman) that a suicide bombing should be attempted on the WTC. According to Ayyad, Rahman had another idea about bombing the WTC and stated that a suicide bombing was not appropriate.

Recently, a source advised [sic] Kiareldeen expressed a desire to murder Attorney general Janet Reno for her role in the conviction of those responsible for the bombing of the World Trade Center. The information developed indicates that Kiareldeen poses a credible threat [sic] Attorney General Reno and potentially others within the United States. A source advised [sic] Kiareldeen stated in the present of others that they, including himself, must kill Janet Reno. Furthermore, Kiareldeen stated that an additional person would assist in the murder of the Attorney General. The FBI took additional steps to test the veracity
of the source reporting the threat against the Attorney general.

App.Vol. II at 25–27.

3. The district court makes the following categorical statements: "[T]he government's reliance on secret evidence violates the due process

does not find its own allegations sufficiently serious to commence criminal proceedings." Id.

This statement illustrates both a simplistic and entirely uninformed view of the processes by which the Justice Department investigates and deals with suspected terrorists within our borders. It completely disregards the often complex determinations involved in releasing confidential counter-terrorism intelligence into the public arena through its introduction into both administrative hearings and court proceedings. Such a criticism implies that the government may only utilize information against an individual in a civil context, such as in deportation procedures, if it also

_____

protection that the Constitution directs must be extended to all persons within the United States, citizens and resident aliens alike." Kiareldeen, 71 F. Supp. 2d. at 414; and the Due Process Clause requires searching scrutiny of "government actions taken against resident aliens such as Kiareldeen." Id. at 409. Through the period of his detention, Kiareldeen never possessed resident alien status. Rather, he was a deportable alien who was in this country illegally, having overstayed his student visa. This is a distinction with a difference.

> "For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal
> Government." Mathews v. Diaz, 426 U.S. 67, 81 (1976). " `[O]ver no conceivable subject is the legislative power of Congress more complete.' " Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Oceanic
> Steam Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909)). Thus, "in the exercise of its broad power over immigration and naturalization, `Congress regularly makes rules that would be unacceptable if applied to citizens.' " 430 U.S., at 792 (quoting Mathews v. Diaz, supra, at 79-80). Respondents do not dispute that Congress has the authority to detain aliens suspected of entering the country illegally pending their deportation hearings, see Carlson
> v. Landon, 342 U.S. 524, 538 (1952); Wong Wing v. United States, 163 U.S., at 235. And in enacting the precursor to 8 U.S.C. S1252(a), Congress eliminated any presumption of release pending deportation, committing that determination to the discretion of the Attorney General. See Carlson v. Landon, supra, at 538-540. Of course, the INS regulation must still meet the (unexacting) standard
> of rationally advancing some legitimate governmental purpose . . ."

Reno v. Flores, 507 U.S. 292, 305-306 (1993).

17

intends to commence criminal proceedings against that same individual. Such a fettering of the Executive Branch has no support in either case law or statute.

In determining when the government's position in immigration matters is substantially justified, especially when dealing with potential terrorists, it is improper to evaluate its position by using traditional standards of proof used in both administrative and court proceedings."The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to `instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of the factual conclusions for a particular type of adjudication.' " Addington v. Texas, 441 U.S. 418, 423 (1979) (quoting In re Winship, 397 U.S. 358, 370 (1970)).

Thus, at one end of the spectrum is the familiar burden of proof in most civil proceedings: preponderance of the evidence. At the other end is the standard of proof designed to exclude, as nearly as possible, the likelihood of an erroneous judgment in a criminal case: proof beyond a reasonable doubt. The intermediate standard, generally utilized in fraud or quasi-criminal matters, requires a higher standard of proof than mere preponderance of the evidence. This is the standard that the government must utilize in removal proceedings. See Woodby v. INS, 385 U.S. 276, 286 (1966) ("We hold that no deportation order may be entered unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds of deportation are true"). See also Ribeiro v. INS, 531 F.2d 179 (3d Cir. 1976). In ascending order, quantifying the amount of evidence required in various proceedings, these burdens of proof may also be expressed as degrees of belief. As one commentator has suggested, "the only sound and defensible hypotheses are that the trier, or triers, of facts can find what (a) probably has happened, or (b) what highly probably has happened, or (c) what almost certainly has happened."4

_____

4. J.P. McBaine, Burden of Proof: Degrees of Belief, 32 Cal. L. Rev. 242, 245-247 (1944).

We are impelled to emphasize, yet again, that in considering the question of attorneys' fees, we do not determine whether the government was substantially justified based upon the result reached in the district court proceeding, or upon an inquiry into whether the government met its stated burden of proof. Substantial justification is measured on the basis of whether the government was justified in initiating the proceeding and going forward with the hearing before the immigration judge. To be substantially justified, the government's position need not be "correct", or even "justified to a high degree." Pierce v. Underwood, 487 U.S. 552, 565, 566 n.2 (1988). Rather, the government must simply have a "reasonable basis in both law and fact" or be "justified in substance or in the main –– that is, justified to a degree that could satisfy a reasonable person." Id. (internal quotation marks omitted).5 Whether the government was substantially justified, therefore, does not present the same question as that presented by the underlying merits of the case. The relevant legal question is "not what the law now is, but what the Government was substantially justified in believing it to have been." Id. at 561.

A court must not "assume that the government's position was not substantially justified simply because the government lost on the merits." Morgan v. Perry, 142 F.3d 670, 685 (3d Cir. 1998) (citation omitted); accord Pierce, 487 U.S. at 569 (reminding that the government "could take a position that is substantially justified, yet lose"); see also S. Rep. No. 96–253, at 7 (1979); H.R. Rep. No. 96–1418, at 11 (1979), reprinted in 1980 U.S.C.C.A.N. 4984, 4990 (stating that the EAJA "should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that its decision to litigate was based on a

_____

5. This court usually expresses this formulation in this manner: To establish reasonable justification, the government must show "(1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory it propounded; and (3) a reasonable connection between the facts alleged and the legal theory advanced." See, e.g., Morgan v. Perry, 142 F.3d 670, 684 (3d Cir. 1998).

19

substantial probability of prevailing"); Clarke v. INS, 904 F.2d. 172, 175 (3d Cir. 1990) ("EAJA is a waiver of sovereign immunity, however, so it must be construed strictly in favor of the United States").

To hold otherwise would force lower level supervisors in anti-terrorist investigations to utilize a cost/benefit analysis in deciding which cases to pursue. Rather than simply pursuing individuals and groups against which the government had the strongest case, they might be reluctant to pursue any case in which a sizeable fiscal loss could result. This would act as a disincentive to faithfully execute all the laws, and could result in the government pursuing only those individuals and groups against whom it appeared to have an almost guaranteed chance of success. Looming large would always be the possibility that, in the event of a mishap by the government's attorney, the government could not only lose its case, it could also lose substantial taxpayer funds as well. Finally, the floodgates of EAJA cases would be opened, subjecting the government to a case similar to this one every time it was unsuccessful. This was certainly not Congress's intent in passing the EAJA, and thus the government's loss does not, ipso facto, manifest a lack of substantial justification.

On the basis of the declassified summary the government furnished to Kiareldeen, we are satisfied that there was ample substantial justification for the position adopted by the government in the habeas corpus proceeding. This is especially true considering the FBI's statement that: "Investigation of international terrorism is necessary to the national security. Counter terrorism investigations are primarily intended to prevent harm to U.S. persons and U.S. interests, but also are designed to prevent harm generally." App. Vol. II at 25-26.

Certainly, in investigating suspected terrorists in immigration matters, the government should not be held to a higher standard than required by Rule Three and Rule Four of the Federal Rules of Criminal Procedure. These rules state that an arrest warrant shall be issued only upon a written and sworn complaint (1) setting forth"the essential facts constituting the offense charged," and (2) showing "that there is probable cause to believe that [such]

20

an offense has been committed and that the defendant has committed it." Fed. R. Crim. P. 3, 4. Additionally, the Fourth Amendment states that ". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This amendment applies to arrest warrants as well as search warrants. Giordenello v. United States, 357 U.S. 480, 485–486 (1958).

C.

Moreover, we should be mindful of the public policy statements reflected by Congress in the 1996 amendment to the INA. Section 240 of the INA states that an alien is not entitled "to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under [the Act]." 8 U.S.C. S 1229a(b)(4)(B). Additionally, on October 26, 2001, President Bush signed the USA Patriot Act of 2001, which was approved by Congress just days before its signing. This Act expanded the investigative powers of our law enforcement agencies. It states that it is designed "to deter and punish terroristic acts in the United States and around the world, to enhance law enforcement investigatory tools, and other purposes."6

D.

We are not inclined to impede investigators in their efforts to cast out, root and branch, all vestiges of terrorism both in our homeland and in far off lands. As the Court has stated:

_____

6. It bears note that H.R. 1266, entitled the "Secret Evidence Repeal Act of 2001," was introduced on March 28, 2001, by Representative David Bonier (D–MI) and was later referred to the Subcommittee on Immigration and Claims of the House Judiciary Committee. This Act, whose objective is to limit the government's use of classified evidence in cases such as Kiareldeen's, nevertheless would still permit such evidence to be used, inter alia, for "terroristic activity deportation." See 8 U.S.C.
S1229a(b)(4)(B). See H.R. 1266, 107th Cong. (2001).

> Few interests can be more compelling than a nation's
> need to ensure its own security. It is well to remember
> that freedom as we know it has been suppressed in
> many countries. Unless a society has the capability
> and will to defend itself from the aggressions of others,
> constitutional protections of any sort have little
> meaning.

Wayte v. United States, 470 U.S. 598, 611-612 (1985). The district court, in its fact finding process, understandably felt shackled by the government's unwillingness to provide Kiareldeen the names and addresses of its counter-terrorism personnel, both in uniform and in civilian clothes. Nonetheless, the public fisc should not lightly be exposed to financial penalties when the war on terrorism is transferred from the domestic battlefield that our country has become, to the vacuum-sealed environment of a federal courtroom, with such civilized accouterments as burdens of proof and axioms of evidence.

We conclude also that the government clearly met the test of being "substantially justified" by drawing an analogy to the concept of probable cause. Inside the courtroom, the profound bundle of constitutional rights remains to protect the petitioners. And in immigration matters, the government may not always be able to prove its case by clear, convincing and unequivocal evidence, but this should never deter its assiduous search to weed out from our midst those who would destroy us. The Court has instructed that

> probable cause requires only a probability or
> substantial chance of criminal activity, not an actual
> showing of such activity. . . In making a determination
> of probable cause the relevant inquiry is not whether
> particular conduct is "innocent" or "guilty," but the
> degree of suspicion that attaches to particular types of
> noncriminal acts.

Illinois v. Gates, 462 U.S. 213, 243-244 n.13 (1983).

The eerie, if not prescient, information that the Joint Terrorism Task Force assembled from its sources, must be evaluated in light of "the degree of suspicion that attaches to particular types of [activities]." Id. In light of the

22

pummeling that the FBI received following the September 11th tragedy for not possessing sufficient intelligence materials, consider the following information revealed by its sources in 1998, dealing with a meeting at which Kiareldeen was allegedly present:

> A source advised that approximately one week before the bombing of the World Trade Center (WTC) in New York, Kiareldeen was present at a meeting with several individuals who were talking about plans to bomb the WTC. The meeting took place at Kiareldeen's residence in Nutley, New Jersey. According to a source, Nidal Ayyad (Ayyad) was present at this meeting (Ayyad is a convicted co-conspirator in the WTC bombing). Ayyad did most of the talking about bombing the WTC as the others listened. Ayyad stated that he suggested to Sheikh Omsar Abdel Rahman (Rahman) that a suicide bombing should be attempted on the WTC. According to Ayyad, Rahman had another idea about bombing the WTC and stated that a suicide bombing was not appropriate.

App. Vol. II at 26.

On July 29, 1998, the Joint Terrorism Task Force had information that Ayyad, the convicted terrorist in the 1993 bombing of the World Trade Center, suggested a suicide bombing of the Center. This understandably created apprehension on the part of the Joint Terrorism Task Force, alerting the government to take all necessary action to investigate all leads and assure the defense of our nation. On September 11, 2001, slightly over two years after the government supplied this information to both the INS and the district court in this case, the convicted terrorist's suggestion became a reality. It is impossible to conjure up a "particular type[ ]" of activity, as mentioned in Gates, that would be more nefarious than that which happened on Black Tuesday. See Gates, 462 U.S. at 243 n.13. Such activity surely constitutes a quantum of suspicion justifying probable cause, as well as substantial justification for the government's conduct in this case.

For all these reasons, therefore, we find "that the position of the United States was substantially justified or that

23

special circumstances make an award unjust," 28 U.S.C.
S 2412(d)(1)(A), and therefore the district court erred in
requiring it to pay Kiareldeen attorneys' fees.

* * * *

We have considered all contentions raised by the parties
and conclude that no further discussion is necessary.

The judgment of the district court awarding attorneys'
fees will be reversed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

24